UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

GILBERT MONTAS,

               **Petitioner,**

vs.
                                      **CASE NO. 8:11-cv-849-T-27TGW**
                                      **CRIM. CASE NO. 8:08-cr-271-T-27TGW**

UNITED STATES OF AMERICA,

               **Respondent.**

_____/

## ORDER

**BEFORE THE COURT** is Petitioner's Motion to Vacate, Set Aside or Correct Sentence

Pursuant to 28 U.S.C. § 2255 (CV Dkt. 1), the Government's Response (CV Dkt. 7), and Petitioner's

Reply (CV Dkt. 10). Upon consideration, Petitioner's motion to vacate is DENIED.

### Procedural Background

Petitioner and his three co-defendants were charged in an indictment with conspiracy to

possess with intent to distribute 500 grams or more of cocaine, in violation of 21

U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. (CR Dkt. 14). On October 7, 2008, Petitioner pleaded

guilty without a written plea agreement. (CR Dkts. 77, 181). On April 2, 2009, Petitioner was

sentenced to 78 months imprisonment to be followed by five years of supervised release. (CR Dkt.

165).

Petitioner appealed his sentence. On January 19, 2010, the United States Court of Appeals

for the Eleventh Circuit affirmed the sentence (CR Dkt. 201). Petitioner did not seek certiorari

review in the United States Supreme Court.

Petitioner signed his Section 2255 motion on April 11, 2011.  (CR Dkt. 207; CV Dkt. 1).

The Respondent does not challenge the motion's timeliness. Petitioner raises six grounds for relief:

**Ground One:**   Ineffective assistance of counsel for not moving to suppress Petitioner's statements in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966);

**Ground Two:**   Ineffective assistance of counsel for not properly advising Petitioner of the potential for an obstruction of justice enhancement if he testified at the sentencing hearing;

**Ground Three:**   Ineffective assistance of counsel for failing to subpoena video records and time logs from the Pinellas County Jail;

**Ground Four:**   Ineffective assistance of counsel for failing to adequately investigate and call three witnesses;

**Ground Five:**   Ineffective assistance of counsel for failing to advise Petitioner of the advantages and disadvantages of pleading guilty; and

**Ground Six:**   Ineffective assistance of counsel for failing to move for dismissal of the indictment based upon the district court's failure to make "ends of justice" findings

## Facts[1]

Petitioner and his co-defendants engaged in drug deals with undercover police officers and were arrested after attempting to purchase several kilograms of cocaine from the officers. After pleading guilty on October 7, 2008, Petitioner was detained in the Pinellas County Jail awaiting sentencing. On March 7, 2009, Petitioner was in the inmate visitation room with other inmates, including Santonio Simmons. Simmons was visiting two female family members through the video conference visitation program at the jail. As Simmons was finishing his visit, Petitioner asked him to leave the phone receiver off the hook when he left the visitation booth so that Petitioner could talk

---

[1] The factual summary derives from the Presentence Investigation Report. (PSR ¶¶ 9, 13-15, 21-22, 29-31, 37).

2

to someone after Simmons finished. Simmons left the phone off the hook as requested and left the visitation area. Leaving the phone off the hook maintains a live video feed between the inmate booth and the family visitation center. Petitioner then went in front of the video camera, exposed his penis, and began to masturbate in front of a fourteen year-old girl and her sister who were visiting another inmate in a nearby visitation booth.

Inmate Simmons and the two female victims identified Petitioner from photopacks as the person who committed these acts. Post-*Miranda*, Petitioner initially told law enforcement that he had exposed himself and masturbated but then recanted his story when he was told that one of the females was only fourteen years old. Petitioner was arrested for lewd and lascivious exhibition involving a minor while in custody at the jail. As a result of that new offense, Petitioner at his federal sentencing lost a three-level downward adjustment for acceptance of responsibility and incurred a two-level upward adjustment for obstruction of justice.

## Standard for Ineffective Assistance of Counsel Claims

*Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims. According to *Strickland*, first, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

*Strickland* requires proof of both deficient performance and consequent prejudice. *Strickland v. Washington*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims v. Singletary*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds."). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland v. Washington*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.*

Petitioner must demonstrate that counsel's error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691-92. To meet this burden, Petitioner must show a reasonable probability that, but for counsel's unprofessional errors, he would not have pleaded guilty and would have insisted on proceeding to trial. *Hill v. Lockhart*, 474 U.S. 59 (1985). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland v. Washington*, 466 U.S. at 690-91. Petitioner

4

cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).

**Ground One**

Petitioner contends that his trial counsel rendered ineffective assistance by not moving to suppress Petitioner's post-*Miranda* statements to the police about exposing himself and masturbating in front of the fourteen year-old victim. During the sentencing hearing Deputy Jeffrey Martin testified on direct examination that after he became aware on Petitioner exposing himself in the visitation area, he met with Petitioner and advised him of his *Miranda* rights:

Q:   After advising Mr. Montas of his *Miranda* warnings, did he indicate that he had some problem in understanding any of those rights?

A:   Yes, sir. He said he didn't understand the word silence.

Q:   And what, if anything, did you do in regard to that statement by Mr. Montas?

A:   I asked Mr. Montas if he was capable of reading English. He stated he could. I then provided him with the card that I had read from. He read it, or appeared to be reading it for a moment, handed it back, stated he understood what he read and agreed to speak to me.

Q:   Did you discuss with him in any regard the incident which had been reported to you?

5

A:     Yes, sir, I did.

Q:     Could you please describe for the court your interview or your encounter with the defendant in regard to the incident?

A:     Yes, sir.  Initially I reminded Mr. Montas that the visitation is video and audio taped.  He stated that he understood that.  I wanted - - I asked him about what had transpired earlier in the evening with the first visitation.  He shrugged and stated he didn't know what I was talking about.

       I advised him of the allegations of him removing his penis and masturbating.  He shook his head and had a smile on his face until I advised him that the girl was 14, at which time he immediately stopped and said, oh no, that wasn't me.

Q:     When you said he shook his head with a smile on his face, was he shaking it in an affirmative manner?

A:     In an affirmative manner.  Yes, sir.

(CR Dkt. 188, pp. 33-34).  Petitioner argues both that counsel should have moved to suppress his statements to Deputy Martin because his waiver of *Miranda* rights was involuntary and that absent Deputy Martin's testimony, a reasonable probability exists that he would have received a three level reduction for acceptance of responsibility.

       To establish counsel's ineffectiveness for failing to competently litigate his Fourth Amendment claim, Petitioner must prove (1) that counsel's representation fell below an objective standard of reasonableness, (2) that he has a meritorious Fourth Amendment claim, and (3) that a reasonable probability exists that a different sentence would have resulted absent Deputy Martin's testimony about Petitioner's statements and conduct.  *See e.g., Zakrzewski v. McDonough*, 455 F.3d 1254, 1260 (11th Cir. 2006) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986)).

       Petitioner fails to establish a meritorious Fourth Amendment claim because he fails to provide any legal basis upon which to exclude the statements.  Even assuming that trial counsel

performed deficiently by not filing a motion to suppress, Petitioner fails to demonstrate that absent counsel's alleged error and despite all of the other evidence adduced at the sentencing hearing,[2] the court would have granted a motion to suppress and Petitioner would have received the reduction for acceptance of responsibility. Absent a demonstration of prejudice, Petitioner cannot prevail on this claim of ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. at 691-92.

**Ground Two**

Petitioner testified at the sentencing hearing and adamantly denied having exposed himself. (CR Dkt. 188, pp. 39-42). The district court concluded, in light of Deputy Martin's testimony and the testimony of both the fourteen year-old victim and her sister, that Petitioner had testified falsely under oath. (CR Dkt. 188, pp. 59-60). Consequently, Petitioner incurred the two-level obstruction of justice enhancement. Petitioner contends that his trial counsel rendered ineffective assistance by not advising him that he could incur a two-level enhancement for obstruction of justice "if the court disbelieved his testimony" at the sentencing hearing. Petitioner argues that he was prejudiced by counsel's error because, if he had been properly advised, he would not have testified and would instead have relied upon counsel's cross-examination of the Government's witnesses and other evidence to rebut the allegation that he had exposed himself. Petitioner asserts that absent his testimony, he would not have received the obstruction enhancement.

"A defendant in a criminal case has a 'fundamental constitutional right to testify . . . at trial.'" *United States v. Teague*, 953 F.2d 1525, 1530, 1532 (11th Cir. 1992) (*en banc*). "Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the

---

[2] In addition to Deputy Martin, both the fourteen year-old victim and her sister testified at the sentencing hearing and affirmatively identified Petitioner as the man who exposed himself and masturbated in front of them at the jail on March 7, 2009. (CR Dkt. 188, pp. 22, 25, 28, 44-46, 49-50).

strategic implications of each choice, and that it is ultimately for the defendant himself to decide." *Id.* at 1533.  However, "a defendant's right to testify does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993).

Even assuming that counsel did not advise Petitioner that he faced a possible obstruction enhancement if the court did not believe his testimony, the record shows that Petitioner had notice of his responsibility to testify truthfully and that a failure to do so could result in his receiving the obstruction enhancement.  The addendum to the Presentence Investigation Report issued before the sentencing hearing explicitly advised Petitioner:

> The government intends to put on evidence related to the alleged new criminal offense in support for its contention that the defendant should not receive a downward adjustment for acceptance of responsibility.  **Should the defendant take the stand to testify in meeting his burden of proof, his testimony must be truthful or he also risks a two-level upward adjustment for obstruction of justice pursuant to USSG ¶ 3C1.1.**

(March 26, 2009, Addendum to the Presentence Report, p. 2) (emphasis added).  Additionally, Petitioner took an oath before testifying at the sentencing hearing averring that he would testify truthfully.  Counsel's failure to mention the possibility of an obstruction enhancement under these circumstances does not rise to the level of ineffective assistance.  *See e.g., Mayes v. United States*, 2007 WL 4302829 at *9 (W.D.Va. Dec. 6, 2007) ("Defense counsel . . . is not required to warn a defendant that testifying untruthfully could lead to a sentence enhancement for obstruction of justice, especially when the defendant has taken the oath.")*; United States v. Williams*, 2005 WL 3303934 at *5 (D. Alaska Dec. 5, 2005) ("Warning a criminal defendant that testifying untruthfully could lead to a sentence enhancement for obstruction of justice is not a requirement for a trial defense attorney under the constitutional standard of effective assistance of counsel."); *Robertson v. United States*, 144 F.Supp.2d 58 (D.R.I. 2001) (finding that defendant was not denied effective assistance of

counsel as result of counsel's alleged failure to inform him that, if his testimony was found to be false, he could be assessed extra punishment for obstruction of justice, where the oath defendant took before testifying informed him of his obligation to testify truthfully). Ground two warrants no relief because the requirements of *Strickland* remain unsatisfied. *Strickland v. Washington*, 466 U.S. at 691-92.

### Ground Three

Petitioner contends that his trial counsel rendered ineffective assistance by both not conducting a meaningful investigation into the events at the jail and by not subpoenaing video recordings or time logs from the Pinellas County Jail. He speculatively asserts that the jail "had video records and time logs that would [have] exonerated him from the allegations of exposing himself." (CV Dkt. 4, p. 11). Petitioner speculatively asserts that "even if the jail did not record or keep recordings of visits, the jail definitely kept time logs of when visitors entered and exited the jail and when a receiver on a visit is hung up, terminating a visit." (CV Dkt. 4, pp. 11-12). Petitioner claims that the time log would have shown that the visitors in the booth next to the victims had hung up the telephone receiver[3] and thus, the victims could not have seen Petitioner masturbating. Petitioner contends that the introduction of such evidence would have resulted in the district court concluding that he did not expose himself, that he would have received the acceptance of responsibility reduction, and that he would not have incurred the obstruction enhancement.

Petitioner offers no evidentiary support for his speculative contention that such evidence

---

[3] The fourteen year-old victim and her sister both testified that the visitors in the booth next to them left the telephone receiver off the hook when they concluded their visit with another inmate. (CR Dkt. 188, pp. 24, 26, 45).

exists[4] or that the Pinellas County Jail keeps such records.  First, as to the videotape, Petitioner suggests only that the video records "would have exonerated him from the allegations of exposing himself."  This assertion, without more, is insufficient to establish ineffective assistance of counsel. While failure to investigate can establish ineffective assistance, mere speculation by Petitioner that favorable evidence *may* exist in insufficient to show either deficient performance or prejudice.  *See Hill v. Lockhart*, 474 U.S. 52 (1985) (conclusory allegations of ineffective assistance of counsel are insufficient to raise a constitutional issue); *Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).

Second, Petitioner offers no evidentiary support for his speculative contention that the Pinellas County Jail keeps time logs of when a visitor hangs up a telephone receiver in the visitation area.  Even assuming such a record exists, the evidence would not have definitively shown that Petitioner did not expose himself as he suggests.  Deputy Susan Kresin testified at the sentencing hearing that visitations at the Pinellas County Jail are conducted by video with inmates and visitors connected through telephone receivers.  The video feed from the visitation center allows visitors to see the inmates but the inmates cannot see the visitors' side until someone picks up the telephone receiver.  (CR Dkt. 188, pp. 5-7).  At the conclusion of a visit, if the telephone receiver is left off the

---

[4] Petitioner offers no evidence, and the record does not show, that a videotape of the incident exists.  Counsel stated at the sentencing hearing that "[t]here evidently aren't videotapes of anything."  (CR Dkt. 188, p. 56).  The prosecutor, when asked by the court about his understanding of whether a video recording exists, stated:

> Your Honor, I've been advised that the Pinellas County Jail videotapes some visitations when there's a specific request by law enforcement or a specific reason to videotape them.  But as a general rule, although there are signs posted indicating that all visitations are subject to videotaping, they do not engage in the videotaping of all visitations because of the volume of visitations that occur at the Pinellas County Jail.

(CR Dkt. 188, pp. 57-58).

hook, the video feed continues streaming. (CR Dkt. 188, pp 14-15). Thus, even if a time log exist showing that the visitors in the booth where Petitioner exposed himself had hung up the receiver as Petitioner suggests, the victims would still have been able to see Petitioner through the video although he would not have seen them. The time logs would not have undermined the testimony of the fourteen year-old victim, her sister and Deputy Kresin. Petitioner's failure to meet either *Strickland*'s deficient performance requirement or prejudice requirement to support this ground of ineffective assistance precludes relief. *See Strickland v. Washington*, 466 U.S. at 691-92.

**Ground Four**

Petitioner contends that his trial counsel rendered ineffective assistance by not calling as witnesses at the sentencing hearing inmate Santonio Simmons and two female visitors in the booth next to the victims. Petitioner argues both that these three witnesses would have testified that he was not in the booth with Simmons and that the witnesses' testimony would have corroborated Petitioner's claim that he did not expose himself.

"Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978) (citations omitted). "The mere fact that other witnesses might have been available . . . is not a sufficient ground to prove ineffectiveness of counsel." *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995). Here, Petitioner fails to name the two female witnesses and fails to show that any of the three witnesses would have been willing to testify on his behalf. Petitioner only speculates on the witnesses' proposed testimony and presents no evidence showing that any of them would have testified as Petitioner hypothesizes. *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991)

11

("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnotes omitted). Petitioner fails to demonstrate that counsel's performance fell outside the bounds of reasonable professional judgment. Petitioner fails to support his speculative contention that the proposed testimony would have resulted in his acquittal of the new offense and fails to meet either *Strickland's* deficient performance requirement or prejudice requirement to support this ground of ineffective assistance. *Strickland*, 466 U.S. at 691-92.

**Ground Five**

Petitioner contends that his trial counsel rendered ineffective assistance by not properly advising him about the advantages and disadvantages of pleading guilty rather than proceeding to trial on his underlying drug conviction. Petitioner argues that counsel's error resulted in Petitioner entering an unknowing and involuntary plea. Petitioner further argues that the factual basis for his plea was not properly established and that he did not unambiguously admit to each and every element of the charged offense.

Contrary to his allegations, the record shows that Petitioner knowingly and voluntarily entered his guilty plea and that the Government presented a factual basis to which Petitioner ultimately agreed:

> [COUNSEL]:    If the court please, we're here today for the purpose of tendering to the court a plea of guilty without the benefit of a plea agreement, straight up, but I had occasion to speak to Mr. Montas a couple of times, and once this morning, and we discussed the facts of the case as set out in the plea agreement, to which he wants the court to understand and to know that he is in agreement with that and that, with

the - - with the - - I guess the added facts, that to get - - to get Mr. Montas involved in this situation, he had been shot earlier.

Mr. Balbuena [Petitioner's co-defendant] had loaned him money and he was there principally because he was hoping that Balbuena would forgive him his debt if he participated in this, and with that understanding, Judge, these facts governing the case are known to the Defendant and he agrees with them.

COURT:          Okay. Well, we might as well get straight to the chase. Does he agree that Balbuena called him to try to arrange a drug transaction?

DEFENDANT:      (through interpreter) Uh-huh.

COURT:          All right.

[COUNSEL]:      Yes, Judge.

[COUNSEL]:      All right.

[COUNSEL]:      Specifically a cocaine transaction.

. . . .

COURT:          Mr. Montas, we have been through the preliminaries of this case before. I have explained to you the rights you have to have a guilty plea heard by a district judge. Do you - - do you remember and understand that right?

DEFENDANT:      (through interpreter) Yes.

. . . .

COURT:          I'm now going to read to you the charge in Count I, which is only one charge, and ask you whether you plead guilty or not guilty to that charge.

Count I reads, "From an unknown date, which was at least on or about April 29, 2008, to on or about May 29, 2008, in the Middle District of Florida and elsewhere, the Defendants, Diogenes Balbuena, Gilberto Montas, Jimmy Morales-Garcia,

and Daniel Sawyer, did knowingly and willfully conspire and agree with each other and with others, both known and unknown to the grand jury, to possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, contrary to the provisions of Title 21, United States Code, Section 841(a)(1), in violation of Title 21, United States Code, Sections 846 and 841 (b)(1)(b).

How do you plead to that charge?  Guilty or not guilty?

DEFENDANT:     (through interpreter) Guilty.

COURT:     The elements of the offense are set out in the Government's notice of essential elements, penalty, and factual basis; and that indicates that what the Government must prove with respect to this charge - - and they must prove it beyond a reasonable doubt - - is that there were two or more people that had a plan to do something that was against the law; and what the Government must prove, because this is what they've charged, is that there was a plan or an agreement or an understanding to possess cocaine with intent to distribute it.

And because there are increased maximum penalties, what they must show is that the plan to possess with intent to distribute cocaine involved 500 grams or more of cocaine and the Government must show that you knew about that plan and that you willfully and voluntarily joined in it.

Do you understand the charge?

DEFENDANT:     (through interpreter) Yes.

COURT:     The Government's statement has a factual basis set out in it. Let me ask if that statement has just been read to you this morning by the interpreter.  Let me ask the interpreter, did you read him that factual statement this morning?

INTERPRETER:     Your Honor, I didn't read it but the attorney read it to him.

[COUNSEL]:     He speaks a rudimentary kind of English, so we went over it.

14

COURT:                Well, let's do this:  Let me have the interpreter read it to the Defendant in Spanish and then I'm going to ask you, Mr. Montas, whether there's anything in that statement that you dispute or disagree with.

                      Why don't you wait a minute?  You ready to go forward?

[COUNSEL]:            Yes, Your Honor.

COURT:                All right, go ahead.

(The interpreter read the statement to the Defendant in Spanish).

COURT:                Have you finished reading the statement?

INTERPRETER:         Yes, Your Honor.

DEFENDANT:           (through interpreter) May I ask you a question about that?

COURT:                Yes.

DEFENDANT:           (through interpreter) May I speak English and see if you can understand me?

COURT:                Sure.

DEFENDANT:           Okay.  It's like he get [sic] arrested before and I don't know that.  So, I owe him money.  I think that's why he come [sic] to me, you know, like a - - to press me to pay him and then sending me to ask Mr. Garcia if he knows somebody who wants to buy coke.

[PROSECUTOR]:        Excuse me.  Can I interrupt?

COURT:                Uh-huh.

[PROSECUTOR]:        If permissible, I would like to do an examination and see if I can get this taken care of or if we're going to have a trial.

COURT:                Right now he's sort of volunteering.  We can go - -

[PROSECUTOR]:        He's saying that Balbuena was arrested sometime in the past before this happened.  Balbuena was arrested the same day.

His - - his contact with Montas had already taken place and Mr. Montas wants to say that somehow he was getting his arm twisted to do this deal after Balbuena was arrested. That's ludicrous and I don't think we should go forward.

If he's not prepared to say that he went to that meeting that day in order to accomplish a cocaine transaction or to broker a cocaine transaction between Mr. Balbuena and these other individuals, then we might as well just cut it short and get out of here.

COURT:            Okay. I don't have any problem with that. But your position is that the arrangement was made before Balbuena - - the arrangement was made with this Defendant to, at least, broker some transaction, that that was made before Balbuena was arrested?

[PROSECUTOR]:     Yes, sir. Balbuena was negotiating a cocaine transaction with an undercover operation [sic].

COURT:            Right.

[PROSECUTOR]:     And while that was going on, he indicated that there were other individuals waiting for two kilograms of cocaine. And so, they - - and he didn't have all the money at that time. [Petitioner] offered to provide title to some vehicle at that time.

After Balbuena inspected his cocaine and was arrested, he began cooperating and a part of that cooperation was to go to those other individuals who were waiting for that [two] kilograms of cocaine. Those other individuals were brought into this transaction by Mr. Montas through his communications earlier or before Mr. Balbuena's arrest with Mr. Balbuena.

So, consequently, he was already on the receiving end, so to speak, of a transaction that was in progress when Mr. Balbuena was arrested. Mr. Balbuena agreed with law enforcement to continue forward with his co-conspirators by going to that parking lot and meeting with the Defendant, which resulted in the Defendant telling Mr. Balbuena, the confidential source, that there was money in a vehicle outside

16

the restaurant and that moved into finishing the transaction where Mr. Sawyer eventually got into the car and inspected the cocaine.

So, I mean, that's the perception of law enforcement from the start to the finish. The facts may not be exact in that regard, but Mr. Montas certainly was a conduit between Mr. Balbuena and these other individuals in putting together a [two] kilogram transaction. Nobody forced him into it.

His compensation might have been for a different reason, for money owed or something like that. If he's not prepared to tell the court today that he brokered that cocaine transaction, then we've got to move out of here and go to trial.

COURT:          Okay. Well, I'm not sure that he was saying a whole lot different. Did you hear the - - first of all, let me back up a little bit. Is there anything in this statement that the interpreter read to you that you dispute or disagree with?

DEFENDANT:      (through interpreter) The only thing's [sic] that I don't know Daniel Sawyer.

COURT:          Okay. But other than the fact that you - - there might be some things you didn't know about, but is there anything that you disagree with that you do know about?

DEFENDANT:      (through interpreter) Well, what I don't agree with about what the paper says is that Mr. Balbuena was arrested before and Daniel Sawyer - - and Garc - - Daniel Sawyer asked me had [sic] how was it that I was here if - - if Garcia had gone to his house to see him with a different purchase?

COURT:          Well, let me just ask this: Did you, after Mr. - - did you, in connection with Mr. Balbuena, arrange for some cocaine sale?

DEFENDANT:      (through interpreter) No. That's the only thing that he asked me through Jimmy Garcia about.

COURT:          Well, did - - did Mr. Balbuena call you and say, "Okay. The deal's on. Have the people who are going to buy the cocaine come to some meeting?"

17

DEFENDANT: (through interpreter) Yeah.

COURT: And did you know that that was going to result in a - - in a transfer from Balbuena to other people?

DEFENDANT: (through interpreter) Yes.

COURT: Did Mr. Balbuena discuss that sale to others before he got arrested that day?

DEFENDANT: (through interpreter) To others?   What do you mean?

COURT: Well, Balbuena was going to buy some cocaine, [two] kilograms of cocaine; and then he was going to sell it to other people.  Did you talk to Mr. Balbuena about that transfer of the cocaine to the other people before he got arrested?

DEFENDANT: (through interpreter) Well, the night before - - the night before was when he told me.  I was eating and he went to where I was and he told me to ask Jimmy Morales if those people were ready to buy the drugs.  So I told him, "Well, why doesn't he himself call him?"

 He said, "Well, because they don't like each other and they don't get along well."

COURT: So, then you asked Jimmy Morales-Garcia if the buyer of the cocaine was ready to go forward with the deal; is that right?

DEFENDANT: (through interpreter) Uh-huh.

COURT: Did you do that the night before Balbuena got arrested?

DEFENDANT: (through interpreter) That same day we were arrested.

COURT: Before he got arrested, before - - when did you talk to Jimmy Morales-Garcia about going forward with the deal?

DEFENDANT: He called me the same day and said he had a guy ready to buy it.

COURT: Had you talked to Jimmy Morales-Garcia previously about a transfer of cocaine?

18

DEFENDANT:        (through interpreter) No.  I asked him, because Balbuena had asked me before.  So, I told him and he said he would let me know.

[COUNSEL]:        So, the answer is, yes, you had talked to him before?

DEFENDANT:        He asked me if - -

[COUNSEL]:        So, I guess the answer is yes, Judge.

COURT:            So, before this phone call came the day that Balbuena got arrested, you had talked to Jimmy Morales-Garcia some - - maybe the day before or some other time before that phone call came?  You had made arrangements and talked to Jimmy Morales-Garcia about the transfer of cocaine to somebody else; is that correct?

DEFENDANT:        (through interpreter) Yes.  When - - yes, when Balbuena asked about it and he said he'd let me know; and then when - - when he let me know, it was that same day that we were arrested.

COURT:            But before that day, had you talked to Jimmy Morales-Garcia about a transfer of cocaine that was going to come from Balbuena?

DEFENDANT:        (through interpreter) Oh, no.

[COUNSEL]:        May I have just a second?

COURT:            Yes.

[PROSECUTOR]:     Judge, from what I heard, I think the Defendant said about a month and a half before that he learned of availability.  So, I think he's getting too close in time to the arrest and that's where the breakdown is coming.  If it was a month and a half before, it's still part of this overall plan.

[COUNSEL]:        That's our position, Judge.  As I'm understanding this as well, Balbuena says that there's - - that there's cocaine - - cocaine available.  He approached Jimmy Morales-Garcia a month or so in advance, as I understand it, and there's a generalized agreement, but it doesn't come to fruition until the day that - -

19

COURT:          So he talks to Morales-Garcia directly?

[COUNSEL]:      I believe so, yes.

COURT:          Balbuena does?

[COUNSEL]:      No (pointing).

COURT:          Oh.

[COUNSEL]:      My client does.

COURT:          Oh, okay.  About a month – about a month or so before?

[COUNSEL]:      Isn't it about a month or so before?

DEFENDANT:      Yes.

[COUNSEL]:      Yes, judge.

COURT:          So, about a month or so before this arrest, Balbuena talked to you about a transfer of cocaine; is that correct?

DEFENDANT:      I said, "I know somebody who wants to buy coke."  He's sending me to Garcia, except he told me he don't [sic] know. So, that night I left for the Dominican for a month and a half. When I get back, then's [sic] when he come to me asking me for the money I owe him.

COURT:          First, let's get to the set-up.  About a month before, Balbuena came to you and asked if you know somebody who wanted to buy some cocaine; is that correct?

DEFENDANT:      Yeah.

COURT:          Then you, around that time, went and talked to Jimmy Morales-Garcia, is that true - -

DEFENDANT:      Yes.

COURT:          - - to make arrangements for him to further set up this cocaine deal; is that correct?

20

DEFENDANT: Yeah. If he know somebody, yeah.

COURT: Okay. And so, then Morales-Garcia is the one that located Sawyer; is that right?

DEFENDANT: Yeah.

COURT: But you - - you were the go-between between Balbuena and Morales-Garcia; is that true?

DEFENDANT: Yeah, because they don't get along.

COURT: Okay. They don't get along. And so, on the day of the arrest, you show up with Jimmy Morales-Garcia; is that true?

DEFENDANT: Yes.

COURT: And then you were aware at that point that the money for the cocaine was in a second car; is that right?

DEFENDANT: I no [sic] say particularly the second car. When I [sic] driving there is when they call me. I said to call me. I said, "I [sic] in front of you in the restaurant." So, he - - when I get out of the car, Mr. Garcia told me, "Tell him the money's here." So I went in and told him, "Hey, the money's out there."

COURT: And you - - you told that to - - who'd you say that to, that the money's outside?

DEFENDANT: Balbuena.

COURT: Okay. And then the - - Balbuena went out and looked at the money?

DEFENDANT: He went out - - walked to the bathroom. When he walked into the bathroom, I got up to leave; but he just turn around and go to the bathroom and the other guy followed me outside. He supposed [sic] to be this cover guy. He said, "Where [is] your car?" I said, "This [is] my car right here." When I go to my car, I said, "Come on." He said, "Jimmy Garcia go to the other car.["] Then they go there. And he asked, "You got the money, boy?" And somebody there - - -I don't know who - - showed him the money.

21

COURT:              Okay.  [Prosecutor]?

[PROSECUTOR]:       Judge, I think that will cover the essential elements.

COURT:              I mean, I - - it sounds like it to me.

[PROSECUTOR]:       Yes.  There may be other details, but I think the Defendant is
                    admitting the conduct that constitutes the essential elements
                    of the crime.

COURT:              Right.  Okay.  Mr. Montas - - and I agree.  I just - - if you
                    don't want to go forward, whether it was good enough or not,
                    I'd stop.  But if you're prepared to go forward, it's all right
                    with me.  I think he's clearly put himself in the middle of this
                    cocaine transaction.

[PROSECUTOR]:       I agree he's acknowledged participation in this conspiracy,
                    Your Honor.

. . . .

COURT:              And is Spanish your native language?

DEFENDANT:          (through interpreter) Yes.

COURT:              And let me ask defense counsel . . . did you ever talk to him
                    with an interpreter?

[COUNSEL]:          Yes, Judge.  I talked to him both with and without an
                    interpreter on numerous occasions.

COURT;              Okay.  When your attorney came to talk to you with an
                    interpreter, did you have any trouble understanding the
                    Spanish being spoken by the interpreter?

DEFENDANT:          (through interpreter) No.  Just a few things that Dominicans
                    say differently from Mexicans but I understood well.

COURT:              Are you having any trouble understanding the Spanish that is
                    being spoken here today when the interpreter is speaking to
                    you in Spanish?

DEFENDANT:          (through interpreter) No.

22

(CR Dkt. 181, pp. 6-19).  The magistrate judge in the remainder of the colloquy advised Petitioner

of the rights he forfeited by pleading guilty, the maximum sentence he faced upon conviction, and

the deportation consequences of the conviction.  (CR Dkt. 181, pp. 20-32).  The magistrate judge

also discussed with Petitioner his rejection of a plea offer from the Government and Petitioner's

satisfaction with counsel's representation.  (CR Dkt. 181, pp. 26, 30, 32-33).  Petitioner ultimately

persisted in his guilty plea which he averred he entered freely and voluntarily without force or

coercion.  (CR Dkt. 181, pp. 33-34).

"For a guilty plea to be entered knowingly and intelligently, 'the defendant must have not only

the mental competence to understand and appreciate the nature and consequences of his plea but he

also must be reasonably informed of the nature of the charges against him, the factual basis

underlying those charges, and the legal options and alternatives that are available.'" *Finch v.

Vaughan*, 67 F.3d 909, 914 (11th Cir. 1995) (quoting *Stano v. Dugger*, 921 F.2d 1125, 1142 (11th

Cir. 1991)).  *See also United States v. Moriarty*, 429 F.3d 1012, 1019 (11th Cir. 2005) ("A court

accepting a guilty plea must comply with Rule 11 and specifically address three 'core principles,'

ensuring that a defendant (1) enters his guilty plea free from coercion, (2) understands the nature of

the charges, and (3) understands the consequences of his plea.").  "[T]he representations of the

defendant [at a Rule 11 plea hearing], as well as any findings made by the judge accepting the plea,

constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in

open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).

Such representations are presumptively trustworthy and considered conclusive absent compelling

evidence to the contrary.  "[W]hen a defendant makes statements under oath at a plea colloquy, he

bears a heavy burden to show his statements were false." *United States v. Rogers,* 848 F.2d 166, 168 (11th Cir.1988).

Aside from his own self-serving allegation, Petitioner produces no evidence to substantiate his claim that he involuntarily entered his guilty plea. Petitioner averred that he entered his plea freely and voluntarily without threat or coercion. (CR Dkt. 181, pp. 33-34). The plea colloquy shows that Petitioner was aware of the nature and elements of the charged offense, the rights he forfeited by pleading guilty, and the possible sentence he faced. Petitioner averred under oath that he understood each of these provisions and that he was satisfied with counsel's representation. Petitioner admitted that he was, in fact, guilty of the charged offense and that it was his decision to enter his plea. Petitioner's sworn statements at the plea colloquy demonstrate the knowing and voluntary nature of his plea. He fails to present any evidence to the contrary. Petitioner likewise presents no evidence establishing that he did not want to proceed with his plea. His unsubstantiated allegations in his motion to vacate fail to overcome the strong presumption of verity afforded his sworn statements made during the plea colloquy. *Blackledge v. Allison,* 431 U.S. at 73-74.

Petitioner fails to substantiate his allegation that counsel failed to advise him of the advantages or disadvantages of pleading guilty rather than proceeding to trial. He likewise fails to substantiate his allegation that he "had a reasonable probability of acquittal at trial." Petitioner presents no evidence of entitlement to relief. *See Hill v. Lockhart,* 474 U.S. 52 (1985) (conclusory allegations of ineffective assistance of counsel are insufficient to raise a constitutional issue); *Tejada v. Dugger,* 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim). Petitioner fails to demonstrate that trial counsel's performance fell outside the bounds of reasonable professional judgment. *Waters v.*

24

*Thomas*, 46 F.3d at 1512; *Chandler v. United States*, 218 F.3d at 1314.   Consequently, he fails to meet *Strickland's* requirements to support this ground of ineffective assistance.   *Strickland v. Washington*, 466 U.S. at 691-92.

**Ground Six**

Petitioner contends that his trial counsel rendered ineffective assistance by not moving for mandatory dismissal of the indictment under the Speedy Trial Act based upon the district court's failure to make "ends of justice" findings when the court granted Petitioner's two motions for continuance of his trial.

A voluntary and intelligent guilty plea forecloses federal collateral review of alleged constitutional errors preceding the entry of the plea. *Tollett v. Henderson*, 411 U.S. 258, 266-67 (1973); *Wilson v. United States*, 962 F.2d 996 (11th Cir. 1992).   Petitioner's ground six alleges ineffective assistance rendered before entry of his guilty plea.   His knowing and voluntary plea waived his antecedent non-jurisdictional claim for relief because the claim does not implicate the validity of the plea. *United States v. Glinsey*, 209 F.3d 386, 392 (5th Cir. 2000), *cert. denied*, 531 U.S. 919 (2000).   Consequently, ground six warrants no collateral review in this motion to vacate.[5]

<u>**Evidentiary hearing**</u>

This case warrants no evidentiary hearing because "it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief." *Broadwater v. United States*, 292 F.3d 1302, 1303 (11th Cir. 2003).

---

[5] Notwithstanding, even if not waived by the guilty plea, ground six lacks merit and Petitioner' is not entitled to relief because he fails to establish both deficient performance and resulting prejudice under *Strickland.*

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1). Rather, a district court must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)). Petitioner has not made the requisite showing in these circumstances. Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

Accordingly, it is **ORDERED AND ADJUDGED** that Petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (CV Dkt. 1) is DENIED. The clerk is directed to enter judgment against Petitioner and to close this case.

**DONE AND ORDERED** in chambers this 18TH day of October, 2012.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Petitioner, *pro se*
Counsel of record

26